**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| WILLIAM A. COLLINS, | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | CIVIL ACTION NO. H-07-1684 |
| | § | |
| | § | |
| MICHAEL J. ASTRUE, | § | |
| COMMISSIONER OF | § | |
| SOCIAL SECURITY, | § | |
| Defendant. | § | |

**MEMORANDUM AND RECOMMENDATION ON**
**MOTIONS FOR SUMMARY JUDGMENT**

This matter was referred by United States District Judge Lee H. Rosenthal, for full pre-trial management, pursuant to 28 U.S.C. § 636(b)(1)(A) and (B).   (Docket Entry # 3). Cross-motions for summary judgment have been filed by Plaintiff William A. Collins ("Plaintiff," "Collins") and by Defendant Michael J. Astrue ("Defendant," "Commissioner"), in his capacity as Commissioner of the Social Security Administration ("SSA").   (Plaintiff's Motion for Summary Judgment, Docket Entry # 18; Plaintiff's Memorandum of Law in Support of Motion for Summary Judgment ["Plaintiff's Motion"], Docket Entry # 19; Defendant's Motion for Summary Judgment ["Defendant's Motion"], Docket Entry # 17).   Each party has also filed a response to the competing motions.   (Plaintiff's Amended Response, Docket Entry # 21; Defendant's Response, Docket Entry # 23).   After considering the pleadings, the evidence submitted, and the applicable law, it is RECOMMENDED that Plaintiff's Motion for Summary Judgment be DENIED, and that Defendant's Motion for Summary Judgment be GRANTED.

**Background**

On April 13, 2005, Plaintiff William Collins filed an application for Social Security Disability Insurance Benefits ("DIB"), under Title II of the Social Security Act ("the Act"). (Transcript ["Tr"] at 14, 25).  In his application, Plaintiff claimed that he has been disabled since September 10, 2003, because he suffers from Graves' disease, hypothyroidism, a back injury, high cholesterol, irritable bowel syndrome, eczema, constipation, joint pain, and heart problems. (Tr. at 16, 67).   In one section, he also claimed to suffer from depression, "poor memory/concentration," and "poor motivation."   (Tr. at 81).   The SSA denied Plaintiff's application on December 14, 2005, finding that he is not disabled under the Act.  (Tr. at 62).  On January 2, 2006, Plaintiff filed a request for reconsideration of the SSA's decision.  (Tr. at 61). The SSA reconsidered his case, but again denied him benefits on February 23, 2006.  (Tr. at 57).

On February 28, 2006, Plaintiff requested a hearing before an administrative law judge ("ALJ").  (Tr. at 56).  In his request, Collins challenged the previous determination, arguing that he was disabled due to hypothyroidism, sleep apnea, sore muscles, sore joints, back pain, and depression.  (*Id.*).  On July 17, 2006, Plaintiff requested an expedited hearing due to the severe financial hardship that resulted from his unemployment.  (Tr. at 50).  The hearing, before ALJ Harry L. Williams, Jr., took place on September 26, 2006.  (Tr. at 357).  Plaintiff appeared and testified at the hearing, and he was accompanied by his attorney, Luther Dulevitz.  (*Id.*).  The ALJ also heard testimony from Dr. Zhou Hoang ("Dr. Hoang"), a medical expert, and from Cecile Johnson ("Ms. Johnson"), a vocational expert.  (Tr. at 359).

On November 15, 2006, the ALJ engaged in the following five-step, sequential analysis to determine whether Plaintiff was capable of performing substantial gainful activity or was, in

fact, disabled:

> 1.      An individual who is working or engaging in substantial gainful activity will not be found disabled regardless of the medical findings.  20 C.F.R. §§ 404.1520(b) and 416.920(b).

> 2.      An individual who does not have a "severe impairment" will not be found to be disabled.  20 C.F.R. §§ 404.1520(c) and 416.920(c).

> 3.      An individual who "meets or equals a listed impairment in Apendix 1" of the regulations will not be considered disabled without consideration of vocational factors.  20 C.F.R. §§ 404.1520(d) and 416.920(d).

> 4.      If an individual is capable of performing the work he has done in the past, a finding of "not disabled" must be made.  20 C.F.R. §§ 404.1520(e) and 416.920(e).

> 5.      If an individual's impairment precludes performance of his past work, then other factors, including age, education, past work experience, and residual functional capacity must be considered to determine if any work can be performed.  20 C.F.R. §§ 404.1520(f) and 416.920(f).

*Newton v. Apfel*, 209 F.3d 448, 453 (5th Cir. 2000); *Martinez v. Chater*, 64 F.3d 172, 173-74 (5th Cir. 1995); *Muse v. Sullivan*, 925 F.2d 785, 789 (5th Cir. 1991); *Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991); *Harrell v. Bowen*, 862 F.2d 471, 475 (5th Cir. 1988).  It is well-settled that, under this analysis, Plaintiff has the burden to prove any disability that is relevant to the first four steps.   *See Wren,* 925 F.2d at 125.   If he is successful, the burden then shifts to the Commissioner, at step five, to show that he is able to perform other work that exists in the national economy.  *See Myers v. Apfel*, 238 F.3d 617, 619 (5th Cir. 2001); *Wren*, 925 F.2d at 125.  "A finding that a claimant is disabled or is not disabled at any point in the five-step review is conclusive and terminates the analysis."  *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

It must be emphasized that the mere presence of an impairment does not necessarily establish a disability.  *See Anthony v. Sullivan*, 954 F.2d 289, 293 (5th Cir. 1992) (quoting *Milam*

*v. Bowen*, 782 F.2d 1284, 1286 (5th Cir. 1986)).   An individual claiming disability insurance benefits under the Act has the burden to prove that he suffers from a disability.   *See Johnson v. Bowen*, 864 F.2d 340, 343 (5th Cir. 1988); *Cook v. Heckler*, 750 F.2d 391, 393 (5th Cir. 1985). Under the Act, a claimant is deemed disabled only if he demonstrates an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of not less than twelve months."   *Selders v. Sullivan,* 914 F.2d 614, 618 (5th Cir. 1990) (citing 42 U.S.C. § 423(d)(1)(A)).   Substantial gainful activity is defined as "work activity involving significant physical or mental abilities to pay or profit."   *Newton*, 209 F.3d at 452.   A physical or mental impairment is "an impairment that results from anatomical, physiological or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."   *Hames v. Heckler*, 707 F.2d 162, 165 (5th Cir. 1983) (citing 42 U.S.C. § 423(d)(3)).   "Furthermore, an individual is 'under a disability, only if his impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. . . .'"   *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994) (citing 42 U.S.C. § 423(d)(2)(A)).

Based on these principles, as well as his review of the evidence presented at the hearing, the ALJ determined that Collins has the following severe impairments: Graves' disease; lower back pain; hypothyroidism; cervical degenerative disk disease; and osteoarthritis in the right knee.  (Tr. at 16).  Although he determined that these impairments, alone or in combination, are "severe," he ultimately concluded that they do not meet or equal in severity the medical criteria

for any disabling impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (Tr. at 17).

He also addressed Collins' alleged mental problems, and stated that, in view of the fact that there

is "no record of treatment by a psychiatrist or psychologist [or] record of psychiatric

hospitalization," they are not severe.  (*Id*.).  The ALJ then assessed Collins' residual functional

capacity, and found that although he is unable to perform his past relevant work as a computer

technician, he does "possess the residual functional capacity to perform the exertional demands

of a wide range of sedentary work" and that he has computer skills that are transferable to other

skilled jobs.  (Tr. at 17, 20).  The ALJ concluded that Collins "has not been under a 'disability,'

as defined in Social Security Act, from September 10, 2003, through the date of [this] decision."

(Tr. at 21).  The ALJ then denied his application for benefits.  (Tr. at 22).

On December 21, 2006, Plaintiff requested an Appeals Council review of the ALJ's

decision.  (Tr. at 10).  SSA regulations provide that the Appeals Council will grant a request for a

review if any of the following circumstances is present:  "(1) there is apparent abuse of discretion

by the ALJ; (2) an error of law has been made; (3) the ALJ's action, findings, or conclusions are

not supported by substantial evidence; or (4) there is a broad policy issue which may affect the

public interest."  20 C.F.R. §§ 404.970 & 416.1470.  On March 16, 2007, the Appeals Council

denied Collins' request, finding that no applicable reason for review existed.  (Tr. at 4).  With

that ruling, the ALJ's findings became final.  *See* 20 C.F.R. §§ 404.984(b)(2) & 416.1584(b)(2).

On May 16, 2007, Plaintiff filed this suit, pursuant to section 205(g) of the Act (codified as

amended at 42 U.S.C. § 405(g)), to challenge that decision.  (Docket Entry # 1).  In his summary

judgment motion, he asks the court to reverse the ALJ's decision to deny him disability benefits,

and to render a judgment in his favor by awarding him "all back pay, rights and privileges."

(Plaintiff's Motion at 15).  Plaintiff also asks the court to review the SSA process for allegedly discriminatory practices against African Americans.  (*Id.* at 15).  Having considered the pleadings, the evidence submitted, and the applicable law, the court recommends that Defendant's motion for summary judgment be granted, and that Plaintiff's motion be denied.

**Standard of Review**

Federal courts review the Commissioner's denial of disability benefits only to ascertain whether the final decision is supported by substantial evidence and whether the proper legal standards were applied.  *See Newton*, 209 F.3d at 452 (citing *Brown v. Apfel*, 192 F.3d 492, 496 (5th Cir. 1999)).  "If the Commissioner's findings are supported by substantial evidence, they must be affirmed."  *Id.* (citing *Martinez*, 64 F.3d at 173).  "Substantial evidence is such relevant evidence as a reasonable mind might accept to support a conclusion.  It is more than a mere scintilla and less than a preponderance."  *Ripley v. Chater*, 67 F.3d 552, 555 (5th Cir. 1995); *see Martinez*, 64 F.3d at 173 (quoting *Villa v. Sullivan*, 895 F.2d 1019, 1021-22 (5th Cir. 1990)).  On review, the court does not "reweigh the evidence, but . . . only scrutinize[s] the record to determine whether it contains substantial evidence to support the Commissioner's decision."  *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995); *see Fraga v. Bowen*, 810 F.2d 1296, 1302 (5th Cir. 1987).  In making this determination, the court must weigh the following four factors: the objective medical facts; the diagnoses and opinions from treating physicians on subsidiary questions of fact; Plaintiff's own testimony about his pain; and Plaintiff's educational background, work history, and present age.  *See Wren*, 925 F.2d at 126.  If no credible evidentiary choices or medical findings exist that support the Commissioner's decision, then a finding of no substantial evidence is proper.  *See Johnson*, 864 F.2d at 343.

## Discussion

Before this court, Plaintiff challenges the ALJ's findings on a number of grounds. (Plaintiff's Motion at 14).   First, Plaintiff claims that the ALJ erred because he abused his discretion in according less credibility to his subjective complaints than to the objective medical evidence.  (*Id*. at 3-4).   In particular, he claims that it was improper for the ALJ to evaluate his demeanor at the hearing when making his credibility determination.  (*Id*. at 5).   Second, Plaintiff appears to claim that the ALJ erred in the third step of the sequential disability evaluation by finding that he does not have an impairment or combination of impairments that meet or medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (404.1520(d), 404.1525, and 404.1526).  (*Id*. at 6).   Third, he claims that the ALJ erred, at the fifth step of the sequential review process, by finding that he is still able to perform sedentary jobs that are available in the national economy.  (*Id.* at 9).   On that point, Plaintiff argues that he is unable to do sedentary jobs because the type and strength of his medication make it hazardous to public safety if he attempts to operate heavy equipment.   (*Id*. at 9-10).   Fourth, Plaintiff appears to argue that the ALJ erred by finding that he had never had surgery, when the record demonstrates that he has had.  (*Id*. at 11).   And in his final claim, Plaintiff contends that the ALJ was biased against him because he is African American.  (*Id.*).

### *Medical Facts, Opinions, and Diagnoses*

The earliest available evidence shows that on January 12, 1996, Collins met with Dr. Joseph B. Guerrini ("Dr. Guerrini"), a family practitioner at the Veterans Hospital of Houston, Texas.  (Tr. at 330).   Collins complained of flu symptoms, sore throat, cough, and nausea.  (*Id.*). Dr. Guerrini gave Plaintiff a note stating that he "may return to work on 1/15/ 96."  (Tr. at 329).

On December 19, 2000, a doctor from McKinney Podiatrics examined Collins' feet and found damage to the skin, including inflammation and lesions between the toes. (Tr. at 325). The doctor determined that Collins had a fungal infection of the skin, and inflammation. (*Id.*). Collins was prescribed a fungal medicine and was instructed to change his socks twice a day. (*Id.*). On January 16, 2001, he returned to McKinney Podiatrics with complaints of pain and tenderness in the big toe of his right foot. (*Id.*). The doctor noted that Plaintiff's original problem had been significantly resolved by the fungal medicine, but that an abscess had formed near the toe. (*Id.*). The doctor drained the abscess, applied antibiotics to Collins' toe, and bandaged the affected area. (*Id.*).

On February 16, 2001, Plaintiff met with Dr. Amani Gobran ("Dr. Gobran"), an ear, nose, and throat doctor and head and neck surgeon, complaining of sleep problems. (Tr. at 344). He was subjected to a comprehensive sleep evaluation, which revealed that he moved through the different stages of sleep in an irregular pattern, resulting in increased wakefulness. (Tr. at 297, 299). However, a subsequent sleep study, performed on April 6, 2001, revealed that Collins' sleep was improved. (Tr. at 298). On the same day, Dr. Gobran had Collins fitted with a continuous positive airway pressure ("CPAP")[1] machine to help him breathe properly while he sleeps. (Tr. at 343). Dr. Gobran stated, however, that Collins was unable to tolerate the machine. (*Id.*).

During the same period, Collins was tested in anticipation of surgery on his nose and thyroid. (Tr. at 338-40). On February 7, 2001, Dr. Cynthia L. Woo ("Dr. Woo"), a radiologist,

---

[1] "Continuous Positive Airway Pressure," or "CPAP," is "a method of noninvasive ventilation assisted by a flow of air delivered at a constant pressure throughout the respiratory cycle." MOSBY'S MEDICAL, NURSING, & ALLIED HEALTH DICTIONARY 392 (5th ed. 1998). "It is performed for patients who can initiate their own respirations but who are not able to maintain adequate arterial oxygen levels without assistance." (*Id.*).

performed a thyroid sonogram on Collins, and noted that he had previously had his left thyroid removed, but that the right thyroid was intact and was normal in size.  (Tr. at 338).  On February 20, 2001, Dr. Jen-Yi Huang ("Dr. Huang"), also a radiologist, performed an iodine uptake and thyroid scan to determine whether a nodule detected near the absent left thyroid was cancerous. (Tr. at 339).  The iodine uptake test revealed normal functioning for the right thyroid.  (*Id.*).  The test also revealed a mild increase in uptake in the region where the left thyroid had been.  (*Id.*). Dr. Huang noted that residual thyroid tissue in the left lobe was responsible for the uptake.  (*Id.*). On April 4, 2001, radiologist Gerald A. Jaffe ("Dr. Jaffe") performed an examination of Collins' chest, which revealed that his heart and lungs were functioning normally.  (Tr. at 340).

On April 11, 2001, following these tests, Dr. Gobran performed thyroid surgery.  (Tr. at 335).  During the surgery, Dr. Gobran removed a nodule from the left thyroid area and removed "inferior turbinates"[2] from Collins' nasal passages to help alleviate his sleep apnea.  (Tr. at 335-36).  The tissue removed from the neck and the nasal passages was submitted for testing after the operation, and revealed inflammation.  (Tr. at 341).

On July 3, 2001, Collins saw Dr. Donald Hearn ("Dr. Hearn"), a family practitioner, complaining of back and knee pain.  (Tr. at 207).  Dr. Hearn advised him to refrain from heavy lifting.  (*Id.*).  Plaintiff returned to Dr. Hearn on July 9, 2001, for what appears to be a follow-up appointment.  (Tr. at 206).  Several tests were ordered and they all came back negative, but it is difficult to discern what the tests were to reveal.  (*Id.*).  Plaintiff saw Dr. Hearn again on November 10, 2001, with complaints of possible stomach ulcers.  (Tr. at 205). There are notations in the doctor's report which appear to suggest that Plaintiff's thyroid-stimulating

---

[2] The term "inferior turbinates" refers to a shell-shaped structure within the muscles of the nose.  *See id.* at 379, 1081, 1665.

hormone ("TSH")[3] levels were measured, although the handwriting is unclear.  (*Id.*).  In addition, it appears that Dr. Hearn considered the possibility that Collins suffers from hypothyroidism.[4] (*Id.*).

On May 28, 2002, Collins had several tests conducted at the Veterans Administration Medical Center ("VAMC") of Houston.  (Tr. at 176-83).  An x-ray view of the clavicles and two views of the cervical spine were taken, which revealed degenerative changes in Collins' spine, including osteophyte formation[5] and disk space narrowing.  (Tr. at 176, 181).  The exams revealed no abnormalities in the clavicles, but the radiologist's report notes that these exams were limited due to the fact no anterior chamber joints were seen.  (*Id.*).  In addition, two x-rays of Collins' right knee were taken.  (Tr. at 178).  They revealed patellar spurring, mild joint space narrowing, and ostephyte formation.  (*Id.*).

In 2002, Plaintiff missed all of the seven appointments scheduled with Dr. Hearn.  (Tr. at 198-204). However, on February 19, 2003, he saw Dr. Hearn for blood work.  (Tr. at 197).  T-3,[6] T-4, and TSH notations all appear on the chart, but the handwriting is otherwise illegible.  (*Id.*). Dr. Hearn ordered a urinalysis, which came back normal.  (Tr. at 211).  Collins missed several more appointments in the early part of 2003.  (Tr. at 193-96).  Then, sometime between May,

---

[3] "Thyroid-stimulating hormone," or "TSH," is "a substance secreted by the anterior lobe of the pituitary gland that controls the release of thyroid hormone and its necessary for the growth and function of the thyroid gland."  *Id*. at 1617.

[4] "Hypothyroidism" is "a condition characterized by decreased activity of the thyroid gland."  *Id*. at 803.  "It may be caused by surgical removal of all or part of the gland, over dosage with antityroid medication, decreased effect of thyroid releasing hormone secreted by the hypothalamus, decreased secretion of thyroid stimulating hormone by the pituitary gland, or atrophy of the thyroid gland itself."  *Id.*

[5] An "osteophyte" is "a bony outgrowth, usually found around the joint area."  *Id.* at 1169.

[6] "Thyroid hormone" is "an iodine-containing compound secreted by the thyroid gland, predominantly as thyroxine (T4) and in smaller amounts as four times more potent triiodothyronine (T3). These hormones increase the rate of metabolism; affect body temperature; regulate protein, fat, and carbohydrate catabolism in all cells; maintain growth hormone secretion, skeletal maturation, and the cardiac rate, force, and output; promote central nervous system development; stimulate the synthesis of many enzymes; and are necessary for muscle tone and vigor."  *Id.* at 1617.

2003, and June 30, 2003, Plaintiff visited Dr. Hearn's office, complaining of back pain.  (Tr. at 192).  Again, Dr. Hearn's report is largely illegible, but a notation of "no lifting" and "missed work: 6/23 - 6/30" is written at the bottom of the page.  (*Id.*).

Between March 21, and June 3, 2003, Plaintiff completed a "work up" for the VMAC. (Tr. at 169).  The physician's report was signed by Dr. Marco Marcelli ("Dr. Marcelli"), an internist, who found that Collins' "thyroid function is within normal range, although his free T4[7] level is on the high range of normal."  (*Id.*).  Dr. Marcelli further commented that Collins was "clinically euthyroid."[8]  (*Id.*).

On August 1, 2003, Collins saw Dr. Guerrini, complaining of tiredness, stress, depression, joint pain, muscle pain, insomnia, heart palpitations, and symptoms of hypothyrodism.  (Tr. at 296).  Tests were performed, which revealed that Collins' low-density lipoprotein[9] ("LDL") cholesterol levels were outside the target range and that red blood cells were present in his blood sample.  (Tr. at 323).  They also revealed, however, that his T-3 uptake and T-4 levels were within the normal range. (Tr. at 289).  On that date, Dr. Guerrini noted that Collins was taking Synthroid.[10]  (*Id.*).  Dr. Guerrini saw Plaintiff for a follow-up appointment on August 10, 2003.  (Tr. at 295).  During that examination, Dr. Guerrini performed a review of systems ("ROS") test, and Collins tested negative for all status ailments, including joint pain. (*Id.*).  Dr. Guerrini diagnosed Collins as suffering from sleep apnea, and referred him to the North East Medical Center Hospital for a sleep study. (Tr. at 293-94).  On September 30, 2003,

---

[7] "Thyroxine," or "T4," is "a hormone of the thyroid gland, derived from tyrosine, that influences metabolic rate."  *Id.* at 1618.
[8] The word "euthyroid" refers to a normal thyroid gland.  *See id.* at 595.
[9] "Lipoprotein" is "a conjugated protein in which lipids form an integral part of the molecule."  *Id.* at 947.  "They are synthesized primarily in the liver; contain varying amounts of triglycerides, cholesterol, phospholipids, and protein; and are classified according to their composition and density."  *Id.*
[10] "Synthroid" is a "trademark for a preparation of levothyroxine sodium."  *Id.* at 1046, 1879.

11

Collins again visited Dr. Guerrini, complaining of flu symptoms and of "scar irritation."  (Tr. at 288).  Dr. Guerrini diagnosed Plaintiff as suffering from atopic dermatisis.[11]  (Tr. at 287).  The doctor gave Collins a work slip, which stated that he could return to work on October 6, 2003, with no limitations.  (Tr. at 285).

On October 25, 2003, Plaintiff returned to Dr. Guerrini, complaining of back pain.  (Tr. at 284).  Dr. Guerrini performed an ROS, and this time, Collins tested negative for all status ailments except for joint pain.  (*Id.*).  Dr. Guerrini also performed a hypothyriod profile.  (Tr. at 282). At the conclusion of the examination, Collins was diagnosed as suffering from back pain. (*Id.*).  Dr. Guerrini referred him to a physical therapist, and ordered an x-ray of his lumbar spine. (Tr. at 279).  The hypothyriod profile showed that Collins' T3 uptake and T4 levels were normal. (Tr. at 283).  The lumbar spine x-ray showed that Collins' "vertebral bodies, disk[k] spaces, and pedicles [were] within normal limits, and that he suffered "no acute bony abnormality."  (Tr. at 280).  Dr. Guerrini also wrote a prescription for Xanax,[12] an anti-anxiety medication.  (Tr. at 281).  On November 4, 2003, Collins had a follow-up appointment with Dr. Guerrini, concerning the lab and x-ray results.  (Tr. at 277).  In his report, Dr. Guerrini noted that Plaintiff had complained of lower back pain, but that the x-rays came back negative.  (Tr. at 274).  Dr. Guerrini's conclusion, based in part on the negative x-rays, was "unknown prognosis" with no "concurrent condition."  (*Id.*).  Dr. Guerrini also stated that "no permanent impairment" would result from Collins' claimed back injury.  (*Id.*).  Dr. Guerrini further noted that Collins was

---

[11] "Atopic dermatis" is "an intensely pruritic, often excoriated inflammation commonly found on the face and antecubital and popliteal areas of allergy-prone (atopic) individuals."  *Id*. at 143-44.  "In adults the disease manifests itself with crusting and excoriation."  *Id.*

[12] "Xanax" is "a short-acting benzodiazepine used as an antianxiety agent in the treatment of anxiety disorders and panic disorders and for short-term relief of anxiety symptoms."  *Id.* at 55.

supposed to receive physical therapy for his lower back, but that he had not yet scheduled any appointments.  (*Id.*).  Dr. Guerrini gave Collins a work slip, which stated that he could return to work on October 28, 2003, with "no restrictions."  (Tr. at 275).

On October 14, 2003, Collins saw Dr. Davill Armstrong ("Dr. Armstrong"), an internist, who diagnosed Collins as suffering from hypothyroidism and depression.  (Tr. at 186).  Dr. Armstrong repeated that diagnosis on July 1, 2004.  (Tr. at 185).  There is no indication that the doctor prescribed anti-depressants.  On November 19, 2003, Plaintiff was again seen by a doctor at McKinney Podiatrics.  (Tr. at 326).  The doctor noted that Plaintiff had blisters on the boot of his right foot and dry, cracking, peeling skin.  (*Id.*).

On December 2, 2003, Collins visited the Department of Veterans Affairs ("VA") hospital.  (Tr. at 165).  In a report signed by Dr. Maria Eugenia Velez ("Dr. Velez"), the attending physician, Collins was diagnosed as suffering from irritable bowel syndrome.  (*Id.*).  Dr. Velez noted that the irritable bowel syndrome was not caused by thyroid disease.  (*Id.*).  Dr. Velez also reported that Collins' TSH levels were "nearly normal" and that they could "be easily corrected if the Synthroid [was] increased maybe to 200 mg."  (*Id.*).  Dr. Velez further noted that Collins "is mobile and takes care of himself."  (*Id.*).

During this time, Collins filed an application with the VA Houston Regional Office for service-connected disability benefits.  (*See* Tr. at 155).  On January 29, 2004, the VA Decision Review Officer concluded that, effective February 23, 2003, Collins was unemployable and was eligible for benefits.  (Tr. at 154, 157).  In making this decision, the officer found that Collins suffered from Graves' disease,[12] which had been 60 percent disabling since February 22, 2002,

---

[12] "Graves' disease" is "a disorder characterized by pronounced hyperthyroidism usually associated with an enlarged thryroid

and from chronic back strain, which had been 10 percent disabling since September 3, 2003.  (Tr. at 154).  Concerning Collins' back strain, the officer made the following comments:

> Physical examination of your lumbar spine revealed no clear scoliosis or other bony deformities. There was no tenderness of the spine. Range of motion of the lumbar spine flexion from 0-80 degrees without pain. Extension up to 25 degrees without pain. Lateral bending 20 degrees bilaterally associated with mild pain. Straight leg raising was negative. The final impression is low back strain.

(Tr. at 156).  After evaluating all of Collins' alleged disabilities, the officer concluded, based on the VA's combined rating scale, that he was 60 percent disabled.  (Tr. at 155).

On February 16, 2004, Collins saw Dr. Guerrini for his annual physical examination. (Tr. at 273).  During the examination, Dr. Guerrini performed a ROS test, and Collins tested negative for all status ailments, including joint pain.  (*Id.*).  Dr. Guerrini also had blood work done, and although the blood work revealed that Plaintiff's T3 uptake and T4 levels were within the normal range, they found his TSH levels to be abnormal.  (Tr. at 272).  Dr. Guerrini adjusted Collins' Synthroid dosage to 200 mg. (*Id.*).

Plaintiff visited Dr. Guerrini's offices on May 10, 2004, for an additional hypothyroid profile.  (Tr. at 260).  During the examination, Dr. Guerrini performed another ROS test, and Plaintiff tested negative for all status ailments, including joint pain.  (*Id.*).  However, the blood work now revealed abnormal T4 and TSH levels.  (Tr. at 259).  Plaintiff returned on May 14, 2004, for a follow-up appointment, and a ROS again showed him to be negative for all status ailments, including joint pain.  (Tr. at 254).  Nevertheless, Dr. Guerrini reported that Collins was "disabled, due to Hypothyroidism and back strain."  (Tr. at 252).

---

gland and exophthalmos (abnormal protrusion of the eyeball)."  *Id*. at 712.  "Hyperthyroidism" is "a condition characterized by hyperactivity of the thyroid gland."  *Id*. at 795.

On June 11, 2004, Dr. Guerrini signed a "Certification of Total and Permanent Disability" on Collins' behalf for the United States Department of Education.  (Tr. at 320).  That report was a follow-up to an earlier one titled "Total and Permanent Disability Form," in which Dr. Guerrini stated that Plaintiff was "unable to work and earn money because of an injury or illness that is expected to continue indefinitely or result in death."  (*Id.*).  However, when asked on the form if the claimant would ever be able to engage in any gainful employment, Dr. Guerrini agreed that he would eventually be able to return to work.  (*Id.*).  In addition, Dr. Guerrini stated that Collins could not be considered 100% disabled, as "per the Department of Veteran's Affairs, [Collins' thyroid condition] is at 60%."  (*Id.*).

On August 22, 2004, Plaintiff saw Dr. Hearn, complaining of flu-like symptoms.  (Tr. at 190).  It appears that blood work was done, but unfortunately, the majority of the physician's report is illegible.  (Tr. at 190).

On November 5, 2004, Plaintiff returned to Dr. Guerrini, complaining of back pain and requesting a referral to a physical therapist.  (Tr. at 240).  Dr. Guerrini performed an ROS on Collins, who tested negative for all status ailments except for joint pain.  (*Id.*).  Dr. Guerrini perscribed a 7.5 mg dose of Vicodin and a 20 mg dose of Levitra.  (Tr. at 239).  Dr. Guerrini also performed a hypothyroid profile.  (Tr. at 237).  The results of the test were normal, as Collins' T3 uptake and T4 levels were within the target range.  (Tr. at 238).  Dr. Guerrini advised Collins to continue his medications, and he referred him to a physical therapist. (Tr. at 236-37).  Subsequently, Dr. Guerrini referred Collins to Healthsouth, a rehabilitation hospital in Humble, Texas, on November 16, 2004, to receive physical therapy for his lower back and his knee.  (Tr. at 235).  According to Dr. Guerrini's report, the treatment was to last four weeks, with three

therapies a week.  (*Id.*).  However, there are no records to indicate that Plaintiff ever attended these therapy sessions.

In January of 2005, Collins failed to appear for a doctor's appointment scheduled with Dr. Hearn.  (Tr. at 189).  On February 4, 2005, he saw Dr. Hearn for a checkup, but, unfortunately, his report is difficult to read.

On September 6, 2005, Plaintiff visited Dr. Guerrini for a physical examination.  (Tr. at 224).  During the exam, Dr. Guerrini performed an ROS, and Collins tested negative for all status ailments, including joint pain.  (*Id.*).  He also had a hypothyroid profile taken, and it revealed no abnormalities in his T3 uptake, or T4 or TSH levels.  (Tr. at 223).  However, on December 6, 2005, Dr. Guerrini filled out a "Doctor's Statement," which was to be furnished to Plaintiff's insurance company.  (Tr. at 334).  On the form, Dr. Guerrini diagnosed Collins as suffering from lower back pain and hypothyroidism, and stated that he was permanently disabled.  (*Id.*).  On a list of "physical impairments," Dr. Guerrini checked the box to indicate that Collins had a "Class 5" impairment, defined as a "[s]evere limitation of functional capacity; incapable of minimum (sedentary) activity."  (*Id.*).  The records from Dr. Guerrini also show that Collins started taking Zoloft, an anti-anxiety and anti-depression medication, in September, 2005, but indicate that he stopped taking the medication in November, 2005.  (Tr. at 220).  In a report dated December 6, 2005, Dr. Guerrini wrote a "new Rx for Xanax."  (Tr. at 319).

On February 7, 2006, Collins saw Dr. Jyothi Achi ("Dr. Achi"), a family practitioner, complaining of Graves' disease, back pain, and heart problems.  (Tr. at 306).  During the examination, Dr. Achi noted that Collins had normal joint movement except for the right hip joint and the right knee joint.  (Tr. at 307).  Dr. Achi stated there was a "marked shortening of the

right leg." (*Id.*). She further stated that Collins' "knee joint movement of the right leg is also restricted," noting, however, that there was no evidence of motor or sensory deficits, or loss of any reflexes. (*Id.*). Concerning Collins' lower back, Dr. Achi noted evidence of spinal muscle spasms, but stated that an x-ray of the lumbar spine was "unremarkable." (Tr. at 304). Dr. Achi requested an additional x-ray of Collins' joints, but reported that he "denied any joint pains." (Tr. at 306). In her final diagnostic impression, Dr. Achi made the following comments about Collins' condition:

> Chronic low-back pain; Pain is always 10/10; His movements are restricted; Spinal movements are restricted; He could not squat and could not jump; He cannot stand or sit for a long time.

(Tr. at 308). Dr. Achi further noted that Collins' thyroid condition could be "controlled with Synthroid." (*Id.*).

On February 14, 2006, on behalf of the state, Dr. Kim Rowlands ("Dr. Rowlands"), an internist, completed a physical RFC assessment of Collins. (Tr. at 309-16). In a section titled "external limitations," Dr. Rowlands stated that Collins could occasionally lift or carry up to 50-pound items, and could frequently lift or carry 25-pound items. (Tr. at 310). She also stated that he could stand or walk, with normal breaks, for a total of 6 hours in an 8-hour workday, could sit, with normal breaks, for a total of 6 hours in an 8-hour workday, and had unlimited use of his upper and lower extremities in conjunction with the operation of hand or foot controls. (*Id.*). In a section titled "postural limitations," Dr. Rowlands stated that Collins could occasionally climb a ramp or stairs, balance himself, stoop, kneel, crouch, and crawl. (Tr. at 311). However, she stated that Collins was unable to climb any ladders, ropes, or scaffolds. (*Id.*). Dr. Rowlands found that Collins had no manipulative, visual, communication, or environmental limitations.

(Tr. at 312-13).  She concluded that Collins' "alleged limits due to symptoms are not wholly supported by the MEOR/EOR in file."  (Tr. at 316).

On September 21, 2006, Dr. Hema C. Patel ("Dr. Patel"), another internist, examined Collins, also on behalf of the state.  (Tr. at 346).  Dr. Patel reported that Collins was "well developed, well nourished and in no acute distress."  (*Id.*).  He observed no signs of eye problems caused by abnormal thyroid functioning, and no sign of thyroid enlargement.  (Tr. at 347).  Dr. Patel found that there were no murmurs or gallops in Collins' heart, that his bowel sounds were normal, and that no hand tremors were present.  (*Id.*).  In addition, he found that Collins' legs were of equal length and that his posture was within normal limits.  (Tr. at 347-48).  He added, however, that Plaintiff should use a cane to support his right knee, because x-rays revealed degenerative arthritic changes.  (Tr. at 347-49).  Regarding Collins' cervical spine, Dr. Patel found no evidence of radiating pain, muscle spasms, and tenderness, but recognized that an x-ray report showed degenerative arthritis, including extensive degenerative spondylosis, in the cervical spine.  (Tr. at 348-49).  Dr. Patel found tenderness in Collins' thoracic and lumbar spine, and stated that x-rays revealed evidence of degenerative arthritis in that area.  (*Id.*).  And as for Collins' thyroid condition, Dr. Patel noted a "thyroidectomy scar over the anterior neck and laboratory findings [that] note a marginally elevated T4 level with a normal TSH."  (Tr. at 349).  Ultimately, Dr. Patel diagnosed Collins as suffering from "hypothyroidism s/p thyroidectomy with scar," degenerative joint disease of the right knee joints, and "degenerative spondylosis of the cervical, thoracic, and lumbar spine." (*Id.*).  In conclusion, he remarked that the effect of Collins' conditions on his daily activity is that "he has difficulty with prolonged standing, walking, climbing stairs, or carrying a heavy load."  (*Id.*).

18

### *Educational Background, Work History, and Present Age*

At the time of the hearing, Collins was 44 years of age, and had earned an associate's degree in electronic technology.  (Tr. at 363).  At the hearing, Collins testified that his previous work included jobs as a computer technician, but that he stopped working on February 23, 2003, tried to work for another three months, and stopped again on September 10, 2003, because of his medical conditions.  (Tr. at 18, 361).

### *Subjective Complaints*

In his application for benefits, Plaintiff claimed that he has been unable to work since September 10, 2003, due to several impairments.  (Tr. at 346-74).  He first complained of a thyroid condition that began in 1980, and which has caused him to suffer from fatigue, depression, "slowing of thought," poor memory, and difficulty swallowing, all on a daily basis. (Tr. at 346).  He also reported that his thyroid condition results in a sensitivity to cold weather, and stated that he develops hives in cold temperatures.  (*Id.*).  Collins stated that his thyroid condition has also resulted in heart problems; gastrointestinal problems such as constipation; weak, sore muscles and joints; and weight fluctuation.  (*Id.*).  Collins also complained of an injury to his right knee after he was thrown from a truck in a traffic accident in 1982.  (*Id.*).  He explained that he suffers from knee weakness, an inability to walk for long distances, stiffness, daily swelling, locking or "giving out" of the knee, and joint dislocation.  (*Id.*).  He stated that this also causes fatigue.  (*Id.*).  He further claimed that the knee pain is constant.  (*Id.*).  In addition, Collins complained of chronic back strain, which has existed since 1981.  (*Id.*).  He alleged stiffness in his lower back and weakness due to pain.  (*Id.*).  However, Collins stated that he experiences no functional impairments due to his back problems.  (*Id.*).

At the hearing, Collins testified that all of these impairments limit his daily activity.  (Tr. at 365).  He told the ALJ that he can cook "every now and then" and do laundry on occasion, but that he was unable to do yard work or drive for extended periods of time.  (*Id.*).  Plaintiff testified that he has experienced difficulty in dealing with other people since 2001, when he noticed a nodule on his neck.  (Tr. at 367).  He further testified that his thyroid replacement medication was not alleviating any of his ailments, and that his conditions seem to have only worsened since the appearance of the nodule.  (*Id.*).  In addition, Collins testified that he experiences trouble sleeping, fatigue, extreme irritability, moodiness, and memory difficulties.  (Tr. at 368).  He told the ALJ that he suffers from soreness in his lower back, muscle spasms five to ten minutes in duration that occur once or twice daily, excruciating pain in his knee, generalized joint pain, irritable bowels, and bleeding hemorrhoids.  (Tr. at 369-71).  Collins elaborated on his back and knee pain, as follows:

> I was injured in the military with that.  And for the most part, it feels like I've been in a football game.  A lot of times it's sore and my knee grinds together, and just painful.  Excruciating pain.

(Tr. at 370).  Plaintiff testified that he experiences difficulty lifting anything over ten pounds or walking farther than a block, even with the assistance of a cane.  (Tr. at 372).  He also testified that he takes an average of three, 30-minute naps a day to combat fatigue.  (*Id.*).  Finally, he testified that he suffers from sleep apnea, as well as from depression.  (Tr. at 374).

### Expert Testimony

The ALJ also heard testimony from Dr. Zhou Hoang, a medical expert witness.  (Tr. at 375).  From his review of the record, Dr. Hoang testified that the evidence shows that Collins suffers from a thyroid disorder, a thyroid goiter, and Graves' disease.  (Tr. at 376).  He also

20

testified, however, that Collins is euthyroid, meaning that his previous thyroid condition has been corrected, and that his current thyroid activity is normal, or "baseline." (*Id.*). Dr. Hoang did testify that Collins would have to remain on his medication, or he would become hypothyroid. (*Id.*). Dr. Hoang concluded that Collins did not meet the SSA listing for a thyroid disorder. (*Id.*).

As to Collins' subjective complaints of lower back pain, Dr. Hoang testified that the various x-rays of the lumbar spine, taken between November, 2003, and February, 2006, were unremarkable, showing no abnormalities. (Tr. at 376-77). Dr. Hoang stated that examinations showed that Collins' vibrations, deep tendon reflexes, and extremities were all normal. (Tr. at 377). Dr. Hoang recognized that Dr. Achi had reported that Collins had a "marked shortening of the right leg," but pointed out that this was the only entry in the record concerning that. (*Id.*). Dr. Hoang further stated that there was "no objective evidence that he has any abnormality of the bones" and that there were "no other studies to show if he has the problem with the herniated dis[k] or if he has evidence of spinal stenosis." (*Id.*).

Dr. Hoang testified that, although an x-ray of the cervical spine in 2002 showed evidence of degenerative joint disease, none of Collins' physicians noted that condition, or the presence of arthritis of the spine, spinal stenosis, or weakness of the upper spine. (Tr. at 377-78). Dr. Hoang concluded that Collins does not meet the SSA listing for weakness of the spine. (Tr. at 378). Dr. Hoang also testified that, while the record shows that an x-ray of Collins' right knee revealed evidence of some patellar spurring and arthritis, the condition does not meet the SSA listing for major dysfunction of the joints because he can reasonably ambulate, albeit with some pain. (*Id.*).

Dr. Hoang further testified that Collins' sleep problems did not meet the requirements for the SSA listing for sleep apnea. (*Id.*).

Following this summary, Dr. Hoang assessed Collins' residual function capacity as follows:

> Well, we have the latest RFC submitted by the Agency on 8F with ability to lift 25 pounds frequently, and occasionally 50 pounds. Stand and walk six hours, sit six hours. I do not agree with that. Because I am also relying on examination done by the consulting doctor, Dr. Achi . . . on 7F. He put down that he has severe back pain. Pain is always 10 out of 10. His movements are restricted. Spinal movements are restricted. He couldn't squat and couldn't jump. He could not stand or sit for a long time. So for that reason, I think that [his] ability to stand and walk would be decreased. I would put him at three hours - two or three hours out of eight hours applicable to sit and stand. As to his ability to lift, I'll put 10 pounds frequently, occasionally 20 pounds. And not 25 and 50 as, you know, submitted by the Agency. Because of that, there will be some postural limitations. He cannot climb ropes, scaffold, ladder. He can negotiate stairs and ramp occasionally. He can stoop, bend, crouch occasionally. He cannot crawl[] because of the arthritis of the knee. And he cannot balance. There are no visual limitations. There are no limitations. There's no environmental limitations, maybe except for no exposure to vibrations. Because when you have neck pain and knee pain, and you are forced to be in an environment which has a lot of vibration, it will give you pain.

(Tr. at 379). In response to questioning by Plaintiff's attorney, Dr. Hoang elaborated on several of Collins' conditions. He testified that there was no evidence to suggest that Collins was ever given a psychological evaluation, despite having been prescribed medication for depression and anxiety. (Tr. at 380). Plaintiff's attorney also noted that, as early as 2003, Collins' physician wrote in his charts "no lifting." Finally, he asked some questions regarding the medical charts in general:

> Q    Was there something in this period of time that would've limited him to no lifting?

22

A      Well, because other time there was no back pain, so they put down no lifting.  So when you have an acute back sprain, then no lifting would be appropriate.

Q      Would there be periods of time - he testified that he continues to have back spasms.  Periods of time then during the month when he wouldn't be able to lift?

A      Yeah.  Usually if you have acute back pain, I would put no lifting for two weeks, yes.

Q      Can you tell with reasonable medical probability how often that would probably happen?

A      No.  What I can tell you is, you know, we have letters from Dr. Guerinni [*sic*] putting down that he's unable to work. And possible he signed that in December 6 of 2005.  That is - yes, severe limitation of function and capacity, class five.  He's permanently disabled.  And that was date of December 6 of 2005.

(Tr. at 380-81).  At this point in the testimony, the ALJ interrupted to inquire about the medical

charts which appear to conflict on Plaintiff's disability status.

Q      In 5F-6 he gets the annual physical.  There's not any - the way he marks it, and I've looked at his other records - is a positive mark if there's a problem. And he gave all negatives then.

A      All negative, yeah.

Q      All negative.  And also, if you go back to 9F-4, he says he's not disabled, and will be able to work.

A      Right.  So yeah -

Q      And then we go forward - that's '04.  Then we go '05. Then '06 he comes down and says totally disabled.  So his records are not consistent in what he's telling us here.  Not that he doesn't have back pain.  It's just Dr. Guerinni [*sic*], or whatever his name is, is not consistent in what his responses are there.

(Tr. at 381-82).  Plaintiff's attorney then resumed questioning.  Dr. Hoang again testified that the record shows only one instance, on November 5, 2004, in which Dr. Guerrini reported that Collins tested positive for joint pain.  (Tr. at 382).

Plaintiff's attorney then questioned Dr. Hoang regarding the typical side-effects of the various medications Collins takes.  (Tr. at 383).  Because of the soporific effects of some of the medications, Dr. Hoang stated that he would limit Collins' activity, including his exposure to heights, dangerous machinery, and commercial driving.  (*Id.*).  However, Dr. Hoang testified that neither the side effects of the medication, nor any information in the medical record, suggests that Collins requires two to three naps daily.  (*Id.*).  In response to a question posed by the plaintiff's attorney regarding fatigue as a side-effect of the medications, Dr. Hoang responded:

> Yes, that is the possible side effects of the Vicodin. I agree with that. He feels tired. Yes, that could be a side effect of the medication depending on how much he takes. But as I mentioned, usually when you have problems, you usually would notify your treating doctors. And there should be some entry in the medical record that there was some problem with that medication. So the treating doctors would have to either modify the dose or the frequency of medication, or even change the medication if the medication's giving problems really. And I did not see that from my reading of the medical record.

(Tr. at 384).

The ALJ then heard testimony from Cecile Johnson, a vocational expert.  (Tr. at 385). From her review of the record, Ms. Johnson described Collins' prior work experience, as an information technician, as requiring a medium level of physical exertion.  (*Id.*).  Following her summary, the ALJ posed a series of hypothetical questions to Ms. Johnson, as follows:

> Q    And if he could only work - excuse me - walk three hours a day, could he return to that work?
>
> A    No, your Honor.

Q       Is that the national - the way it's performed in the national economy too as
        an information tech at the medium to heavy level?

A       Medium because he's lifting computers, and getting down and squatting.
        So yes, that's how it's performed.

Q       If he's limited to only lifting 10 pounds frequently and 20 pounds
        occasionally.   Standing and walking a maximum of three hours a day.
        Occasionally climbing ramps or stairs.  Never climbing ropes, ladders, or
        scaffolding.  Occasionally stooping, kneeling, and crouching. Never
        crawling.  Not working around dangerous equipment. Not working at
        heights, elevations.   Is there other work that a person the same age,
        education, and vocational history might perform?

A       Yes, sir.  And there also are transferable skills. Do you want to know the
        transferable skills?

Q       Yes.

A       The ability or skills to diagnose or make repairs on computer equipment.
        Extensive knowledge of computer language. A high level of mathematical
        skills.  Ability to analyze, review, and modify programs.

(Tr. at 385-86).  The ALJ continued, inquiring as to whether these skills would be transferable in

light of Collins' residual functional capacity.  (Tr. at 386).  Ms. Johnson responded:

        Yes sir. Such skills would be - or such jobs would be telephone technician which
        is sedentary with an SVP of 7, which is skilled. Computer security specialist
        which is sedentary with an SVP of 6. And data entry operator which is sedentary.
        And customer office - like telephone office repairer which is also sedentary. And
        repair order clerk which is sedentary semi-skilled.

(Tr. at 387). The ALJ then proceeded to ask whether Collins' medications would interfere with

his employment:

Q       Well, let's just say if he needed 15 minutes down after taking his
        medication, could he still do that work?

A       Yes, sir.

Q      Okay. If the medication made him so sleepy that he was requiring a nap
       one in the morning and once in the afternoon, he could not maintain those
       jobs. Is that right?

A      No, sir, he could not -

Q      And he could not maintain competitive employment?

A      No sir, could not.

(*Id.*).

### *The ALJ's Decision*

Following the hearing, the ALJ made written findings on the evidence.  From his review

of the record, he determined that Collins suffers from severe Graves' disease, lower back pain,

hypothyroidism, cervical degenerative disk disease, and osteoarthritis of the right knee.  (Tr. at

16).  He also found that, to the extend Collins alleges mental impairments, they are not severe.

(Tr. at 16-17).  He concluded that Collins does not have an impairment, or any combination of

impairments, which meet, or equal in severity, the requirements of any applicable SSA Listing.

(Tr. at 17).  The ALJ also found that Collins was unable to return to his previous occupation as a

computer technician.  (Tr. at 20, 393).  However, he determined that Collins does have "the

residual functional capacity to perform the exertional demands of a wide range of sedentary

work" that is available in significant numbers in the local and national economy.  (Tr. at 17, 20-

21).  Ultimately, he concluded that Collins was not under a "disability," as defined by the Act,

through the date of the hearing.  (Tr. at 20).  With that decision, he denied Collins' application

for disability insurance benefits.  (Tr. at 22).  That denial prompted Plaintiff's request for judicial

review.

It is well settled that judicial review of the Commissioner's decision is limited to a determination of whether it is supported by substantial evidence, and whether the ALJ applied the proper legal standards in making it. *See Myers*, 238 F.3d at 619; *Newton*, 209 F.3d at 452 (citing *Brown*, 192 F.3d at 496). Any conflict in the evidence is to be resolved by the ALJ, and not the court. *See id.* A finding of "no substantial evidence" is proper only if there are no credible medical findings or evidentiary choices that support the ALJ's decision. *See Johnson*, 864 F.2d at 343-44 (quoting *Hames*, 707 F.2d at 164). Here, from the record as a whole, it is evident that the ALJ's decision is supported by substantial evidence.

Plaintiff first claims that the ALJ erred because he abused his discretion by using subjective criteria in his analysis. (Plaintiff's Motion 4). It is true that in any disability determination, the ALJ "must consider a claimant's subjective symptoms as well as objective medical evidence." *Wingo v. Bowen*, 852 F.2d 827, 830 (5th Cir. 1988). However, there is no question that an ALJ has discretion to weigh the credibility of the testimony presented, and that his judgment on what weight to ascribe to it is entitled to considerable deference. *See Villa*, 895 F.2d at 1024. An ALJ may accept or reject a claimant's subjective statements, as long as the reasons for so doing are made clear. *See Falco v. Shalala*, 27 F.3d 160, 164 (5th Cir. 1994). For example, he may find that the claimant's subjective complaints are "not credible," or he may find the medical evidence to be "more persuasive than the claimant's own testimony." (*Id.*). A claimant's subjective complaints "must be corroborated at least in part by objective medical testimony." *Houston v. Sullivan*, 895 F.2d 1012, 1016 (5th Cir. 1989) (citing *Harrell*, 862 F.2d at 481); *accord* 20 C.F.R. §§ 404.1528(a), 404.1529. If there are conflicts between a claimant's subjective complaints and the objective medical evidence, the ALJ must evaluate the claimant's

27

credibility.  *See* 20 C.F.R. § 404.1529; *Hollis v. Bowen*, 837 F.2d 1378, 1385 (5th Cir. 1988).  In

doing so, the ALJ must consider such factors as stated activities of daily living, current

treatment, medication and any side effects, or other methods of alleviating pain, to determine the

limiting effects of any impairment or symptomology on the claimant's ability to work.  *See* 20

C.F.R. § 404.1529; *Hollis*, 837 F.2d at 1385.

In this case, the ALJ gave specific reasons for his decision to reject Collins' subjective

complaints of pain.  (Tr. at 19-20).  The ALJ stated that "the description of the symptoms and

limitations which the claimant has provided throughout the record has generally been

inconsistent and unpersuasive."  (Tr. at 19).  He also found that "the claimant's description of the

severity of the pain has been so extreme as to appear implausible."  (*Id.*).  On this point, the ALJ

stated that "the claimant's demeanor, actions, and responses at the hearing were not indicative of

a person in pain at all much less a person in such severe, continuous pain."  (Tr. at 20).  All of

that caused the ALJ to view Plaintiff's testimony with "skepticism."  (*Id.*).  He also found the

fact that Collins had repeatedly reported to his physicians that his pain level was a 10/10, but

reported it to be 9.5/10 at trial, to be a significant inconsistency. (Tr. at 19, 308, 346).  The ALJ

stated further that there was a lack of objective evidence in the record to support Collins' limited

daily activities, as alleged.  (Tr. at 19). In fact, Plaintiff testified at trial that he is able to cook,

clean the house, and drive occasionally.  (Tr. at 365).  The ALJ also relied on Collins' treatment

history, stating that "the claimant has not generally received the type of medical treatment one

would expect for a totally disabled individual."  (*Id.*).  The ALJ noted that Collins cancelled or

failed to show up for doctor appointments on a number of occasions.  (*Id.*).  In fact, the record

28

shows that Collins missed every appointment with Dr. Hearn in 2002, several appointments in

2003, and one appointment in January, 2005. (Tr. at 187-207).

The ALJ's decision to reject Collins' subjective complaints of pain is supported by the

record.  For example, the VA records detail that Collins suffers only from lower back strain.  (Tr.

at 155-56).  A letter from the VA indicated that Collins was 10% disabled due to chronic low

back strain, and 60% disabled due to Graves' disease, which is not the pain-inducing impairment

alleged.[13]  (Tr. at 154).  An x-ray of Collins' spine, taken in February, 2006, by Dr. Achi was

"unremarkable."  (Tr. at 307-08).  X-rays of Plaintiff's cervical spine that were taken in

September, 2006, by Dr. Patel, showed only mild degenerative spondylosis of the lower thoracic

spine.  (Tr. at 355).  In addition, the RFC assessment, made in 2006, concluded that Collins'

alleged limits due to painful symptoms were "not wholly supported" by the examination.  (Tr. at

316).  At trial, the medical expert witness, Dr. Hoang, noted that Plaintiff's subjective complaints

of back pain are not consistent with the detailed clinical data.  (Tr. at 382).  Further, on October

25, 2003, when Plaintiff visited Dr. Guerrini complaining of back pain, an x-ray taken of his

spine during the examination revealed that his "vertebral bodies, dis[k] spaces, and pedicles

[were] within normal limits."  (Tr. at 280, 284).  Plaintiff returned to Dr. Guerrini in February and

May, 2004, and again in September, 2005, but tested negative for joint pain on all three

occasions.  (Tr. at 273, 260, 224).  Finally, x-rays taken by Dr. Achi, on February 7, 2006, of

Plaintiff's lumbar spine were unremarkable.  (Tr. at 304).  In light of the record, the ALJ did not

---

[13] The Fifth Circuit has made it clear that a VA disability rating is not binding on the SSA "because the criteria applied by the two agencies is different."  *Chambliss v. Massanari*, 269 F.3d 520, 522 (5th Cir. 2001) (citing *Loza*, 219 F.3d at 394; *Latham v. Shalala*, 36 F.3d 482, 483 (5th Cir. 1994); *Rodriguez v. Schweiker*, 640 F.2d 682, 686 (5th Cir.1981)); *see* 20 C.F.R. § 404.1504.

abuse his discretion in finding that Collins' demeanor, medical history, and daily activity did not correspond to the level of pain he alleged.

Although it is unclear, it appears that Plaintiff also argues that the ALJ erred in stating that Collins had never had surgery in contrast to the record. (Plaintiff's Motion at 13). It is true that, in his written decision, the ALJ stated that Collins had neither been hospitalized nor had any surgery. (Tr. at 19). To the contrary, however, the record shows that Collins has, in fact, undergone at least two surgeries. (Plaintiff's Motion at 11; Tr. at 335-36). In 1980, while stationed in Korea on military duty, Collins underwent an operation to have his left thyroid removed, and he also underwent surgery in April, 2001, to have a nodule excised from his neck. (Tr. at 335-36). Clearly, then, the ALJ was incorrect. However, when examining a claim for disability, "the ALJ is not always required to do an exhaustive point-by-point discussion." *See Audler v. Astrue*, 501 F.3d 446, 448 (5th Cir. 2007). "Procedural perfection in administrative proceedings is not required" so long as "the substantial rights of a party have not been affected." *Id.* (citing *Mays v. Bowen*, 837 F.2d 1362, 1364 (5th Cir. 1988)). The error alleged by a claimant will constitute a basis for remand only "if such improprieties would cast into doubt the existence of substantial evidence to support the ALJ's decision." *Morris v. Bowen*, 864 F.2d 333, 334 (5th 1988). In this case, both of the surgeries the ALJ omitted occurred prior to September 10, 2003, the date on which Collins claimed his alleged disability began. (Tr. at 14). There is substantial evidence in the record to which the ALJ does point that supports his decision. (Tr. 17-20). Further, in light of the other evidence in the record, the ALJ did not rely on his mistaken belief in making his final decision. (Tr. at 19). Under these circumstances, Plaintiff's rights were not affected, and remand is not required by the ALJ's mistake in stating that Collins never underwent

surgery.  Plaintiff also complains that the ALJ was mistaken in finding that "there is no record of treatment by a psychiatrist or psychologist nor is there a record of psychiatric hospitalization." (Plaintiff's Response at 14).  However, there is no evidence that contradicts the ALJ's finding, and Collins points out only that he has taken the anti-anxiety or anti-depressant medications Zoloft and Xanax, which were prescribed by Dr. Guerrini and Dr. Armstrong, both internists. (*Id.*; *see* Tr. at 186, 281, 319).  Under these circumstances, the ALJ's statement appears to be correct.[14]

Plaintiff also complains that the ALJ erred because he failed to find that his condition meets the requirements of the applicable Listings.  (Plaintiff's Motion at 6).  This argument requires a review of the specific regulations at issue.  The first relevant SSA Listing, 1.02A, provides, as follows:

> **Major dysfunction of a joint(s)** (due to any cause): Characterized by gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing; bony distruction, or ankylosis of the affected joint(s). With:
> A. Involvement of one major peripheral weight-bearing joint (i.e. hip, knee, or ankle), resulting in inability to ambulate effectively, as defined in 1.00B2b; or
> B. Involvement of one major peripheral joint in each upper extremity (i.e., shoulder, elbow, or wrist-hand), resulting in inability to perform fine and gross movements effectively, as defined in 1.00B2c.

---

[14] Plaintiff does not appear to raise a direct challenge to the ALJ's finding that his alleged mental impairments were not "severe" within the meaning of the Act.  The court notes that the record contains little mention of mental impairments, aside from the occasional reference to "depression" or "moodiness" within a report on Collins' physical health.  (*See, e.g.,* Tr.at 186, 281, 319). There is evidence that Collins was prescribed anti-anxiety or anti-depressant medications on at least two occasions.  (*See id.*). However, there are no records that detail the reasons for these prescriptions, or that show that Collins was in any other way receiving treatment for mental impairments.   Further, on March 21, 2003, and November 17, 2005, Collins expressly denied feeling depressed.  (Tr. at 142, 166).

20 C.F.R. Pt. 404, Subpt. P, App. 1 § 1.02A.   A claimant also may be found to have an impairment that is "medically equivalent" to a listed impairment, if the medical findings in the record are at least equal in severity and duration to the findings for a listed impairment.  *See* 20 C.F.R. §§ 404.1526(a), 416.926(b).  This "equivalence" must be based on medical findings only, and those findings must be supported by medically acceptable clinical and laboratory diagnostic techniques.  *See id.*  Here, there is no dispute that Plaintiff has an impairment of his right knee. (Tr. at 16).  The ALJ recognized that Collins' physicians repeatedly diagnosed him as suffering from osteoarthritis of the right knee.  (*Id.*).  In October 2006, an x-ray of Collins' knee revealed degenerative joint disease.  (Tr. at 349).  This diagnosis is clear evidence that his impairment meets the first threshold of the Listing, as degenerative joint disease is a type of joint space narrowing. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.04A.

However, there is ample evidence in the record that supports the ALJ's conclusion that Plaintiff's impairments did not meet, or equal, the entirety of the SSA Listing.  For example, from that same x-ray taken in October of 2006, the physician noted that, while Plaintiff may feel pain, weakness, and lack of endurance, the joint function of his right knee was not limited by "fatigue and incoordination" after repetitive use.  (Tr. at 348).  In addition, Collins' range of motion in his right knee was found to be within normal limits.  (Tr. at 347).  Two other medical examinations, both of which occurred in 2006, showed Collins to have some or all of the following attributes:  normal ligament stability; no muscle atrophy; no motor deficiencies; and no effusion, fluid, or joint deformity.  (*See, e.g.*, Tr. at 306-08 [Dr. Achi]; Tr. at 346-50 [Dr. Patel]). And Dr. Patel performed a range of motion test that revealed that Plaintiff's flexion movement was within the normal range and that his joint function was limited by "0 degrees."

(Tr. at 347-48).  In addition, there is scant evidence, beyond Plaintiff's own testimony, of any significant inability to ambulate effectively.   Indeed, Dr. Patel found that Plaintiff could ambulate with the assistance of a cane, and that his condition caused neither muscle weakness nor muscle wasting. (Tr. at 347).  This conclusion is further corroborated by Dr. Rowlands' findings that Collins could stand or walk for a total of six hours during a regular eight-hour work day.  (Tr. at 310).  Dr. Rowlands also found that Collins could occasionally climb ramps or stairs, balance himself, stoop, kneel, crouch, and crawl during an eight-hour work day.  (Tr. at 311).  And further, at the hearing, Dr. Hoang testified that Collins did not meet the requirements of Listing 1.02A because he was "still able to ambulate."  (Tr. at 378).  On this record as a whole, it is clear that substantial evidence supports the ALJ's conclusion that Plaintiff's impairments do not meet, or equal, Listing 1.02A.

The next relevant SSA Listing, 1.04, states the following:

**1.04 Disorders of the spine** (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative dis[k] disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With:
A.    Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine); or
B. Spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manigested by severe buring or painful dysesthesia, resulting in the need for changes in position or posture more than once every two hours; or
C. Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b.

20 C.F.R. Pt. 404, Subpt. P, App. 1 § 1.04.   Here, there is no dispute that Collins has an impairment of the spine.  (Tr. at 16).   The ALJ recognized that Collins had been diagnosed as suffering from both lower back pain and cervical degenerative disk disease.  (*Id.*).  In September, 2006, Dr. Patel stated that Collins' condition had progressed to degenerative spondylosis of the spine, as supported by an x-ray that showed diffuse, moderate degenerative changes.  (Tr. at 345-46).   These diagnoses are clear evidence that the impairments meet the first threshold of the Listing, because osteoarthritis is a degenerative change.  *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.04A.   However, there is ample record evidence that supports the ALJ's conclusion that Collins' impairments do not meet, or equal in severity, the entirety of Listing 1.04.   None of the x-rays of Plaintiff's spine indicates the presence of nerve root compression, arthritis, or lumbar spinal stenosis.  (Tr. at 377-78).   On November 5, 2004, Dr. Guerrini performed a physical examination of Plaintiff and ordered an x-ray of his lumbar spine.  (Tr. at 331).  The x-ray was negative for all status ailments and the doctor stated that no permanent impairment would result from Collins' alleged back injury.  (*Id.*).  On February 7, 2006, Dr. Achi ordered another x-ray of Plaintiff's lumbar spine.  (Tr. at 304).  The results were "unremarkable."  (*Id.*).  An x-ray of the lumbar spine performed by Dr. Patel, in September, 2006, revealed some degenerative arthritis and diffuse moderate degenerative changes, but again, no objective evidence suggests that Plaintiff's condition meets or equals the requirements of Listing 1.04.  (Tr. at 349).   In light of these findings, the medical expert witness, Dr. Hoang, testified that Plaintiff did not meet the requirements of Listing 1.04.  (Tr. at 378).   Dr. Hoang also testified that there was insufficient objective medical evidence to show that Plaintiff met the requirements of the Listing.  (Tr. at 377-78).   More significantly, Dr. Hoang testified that Collins could not, in any event, meet the

requirements of Listing 1.04 because he is still able to walk.  (Tr. at 378).  In short, the record, as

a whole, is replete with evidence supporting the ALJ's conclusion that Plaintiff's impairments do

not meet, or equal in severity, Listing 1.04.

The SSA Listing relevant to Collins' alleged sleep disorder is 3.10, which provides, as

follows:

> 3.10 **Sleep related breathing disorders**. Evaluate under 3.09 (chronic cor
> pulmonale) or 12.02 (organic mental disorders).

20 C.F.R. Pt. 404, Subpt. P, App. 1 §3.10. Listing 3.09 states as follows:

> 3.09 **Cor pulmonale secondary to chronic plumonary vascular hypertension**.
> Clinical evidence of corpulmonale (Documented according to 3.00G) with:
> A. Mean pulmonary artery pressure greater than 40 mm Hg; or
> B. Arterial hypoxemia. Evaluate under the criteria in 3.02C2
> C. Evaluate under the applicable criteria in 4.02.

*Id*. at §3.09.  The ALJ found that Collins has not shown that he has met the listing requirements

or has an impairment equal in severity to these requirements.  (Tr. at 16).  Collins was diagnosed

by Dr. Gobran as suffering from a "mild degree of obstructive sleep apnea."  (Tr. at 344).

However, none of the tests performed on Collins showed any evidence of sleep related breathing

disorders to the degree covered by Listing 3.10.  In fact, the record reflects that only two

procedures related to his alleged sleep disorder were performed on Plaintiff.  (Tr. at 343).  In

April, 2001, Dr. Groban performed surgery on Plaintiff's nasal passages, and prescribed a CPAP

machine, but he was unable to tolerate it.  (Tr. at 335-36).  Plaintiff was also given a

comprehensive sleep evaluation.  (Tr. at 297). During his first evaluation in February, 2001,

Plaintiff was diagnosed with a sleep efficiency of 87.4 % after being subjected to a 6.8 hour-long

study.  (*Id*.).  In the study, Collins was asleep for 5.9 hours.  (*Id*.).  In April, 2001, Plaintiff

returned for a second evaluation and was diagnosed with a sleep efficiency of only 10.6 %.  (Tr. at 298).  However, Plaintiff was only studied for an hour and was actually asleep for only 6.5 minutes during the examination.  (*Id.*).  At the hearing, Dr. Hoang testified that Collins did not meet the requirements for Listing 3.10.  (Tr. at 378).  Indeed, there is no empirical evidence of record that Plaintiff meets any of the medical requirements for sleep related breathing disorders pursuant to Listing 3.10.

Finally, Plaintiff contends that his condition meets or equals the Listing for thyroid disorders.  Listing 9.02 states the following:

> 9.02 **Thyroid disorders**: Evaluate the resulting impairment under the criteria for the affected body system. See 9.00

20 C.F.R. Pt. 404, Subpt. P, App. 1 § 9.02.  Listing 9.00 provides, as follows:

> 9.00 **Endocrine System**. Cause of impairment. Impairment is caused by overproduction or underproduction of hormones, resulting in structural or functional changes in the body. Where involvement of other organ systems has occurred as a result of a primary endocrine disorder, these impairments should be evaluated according to the criteria under the appropriate sections. Medically acceptable imaging includes, but is not limited to, x-ray imaging, computerized axial tomography (CAT scan) or magnetic resonance imaging (MRI), with or without contrast material, myelography, and radionuclear bone scans. "Appropriate" means that the technique used is the proper one to support the evaluation and diagnosis of the impairment.

*Id*. at § 9.00.  Here, Plaintiff has failed to produce evidence that he is suffering from a qualifying thyroid disorder.  Plaintiff had a thyroidectomy in 1980 to remove his left thyroid and, in 2001, he had surgery to remove a nodule from the area where the left thyroid had been.  (Tr. at 335, 346).  During Dr. Patel's 2006 medical examination, Collins was diagnosed with hypothyroidism based on both subjective complaints and an objective exam that revealed marginally elevated T4 levels.   (Tr. at 349).  Dr. Patel noted that Plaintiff requires Synthroid to correct his

hypothyroidism.   (*Id.*).   At the hearing, Dr. Hoang testified that Plaintiff's condition had been corrected, noting that Collins' medication has normalized his condition, so that he is now euthyroid.   (*Id.*).   Dr. Hoang testified that Collins should remain euthyroid as long as he continues on the medication.   (*Id.*).   Dr. Hoang testified that Collins did not meet the Listing for a thyroid disorder because his condition had stabilized.   (*Id.*).   The Fifth Circuit has also held that a medical condition is not disabling if it can be remedied by medication.   *See McKnight v. Sullivan*, 927 F.2d 241, 242 (5th Cir. 1990) (*citing Lovelace,* 813 F.2d at 59).   Because Plaintiff's hypothyroidism has been corrected by medication, the ALJ did not err in concluding that Plaintiff's condition does not meet, or equal in severity, the requirements of Listing 9.00.   (Tr. at 18).

While it is unclear whether Plaintiff challenges the weight that the ALJ gave to the testimony of Plaintiff's attending physician, Dr. Guerrini, the court will address the issue in an abundance of caution.   (*See* Plaintiff's Motion at 10-11).   In his written decision, the ALJ stated that Dr. Guerrini's medical opinion "is not well supported by medically acceptable clinical and laboratory techniques" and is "inconsistent with the other substantial evidence of record, including his own prior statements," and, consequently, did not deserve controlling weight.   (Tr. at 19).   SSA regulations require the Commissioner to evaluate every medical opinion that is received in evidence on a claimant's behalf.   *See* 20 C.F.R. § 404.1527(d).   And, generally, more weight is given to the opinion of a treating physician than to those given by other medical professionals, including examining physicians and medical expert witnesses.   *See Myers,* 238 F.3d at 621; *Loza v. Apfel*, 219 F.3d 378, 381 (5th Cir. 2000); *Greenspan*, 38 F.3d at 237; 20 C.F.R. § 404.1527(d)(2).   Indeed, the Fifth Circuit "has repeatedly held that ordinarily the

opinions, diagnoses and medical evidence of a treating physician who is familiar with the claimant's injuries, treatment, and responses should be accorded considerable weight in determining disability." *Loza*, 219 F.3d at 395; *see Myers*, 238 F.3d at 621; *Greenspan*, 38 F.3d at 237. However, "[t]he ALJ may give less weight to a treating physician's opinion when 'there is good cause'" to do so. *Loza*, 219 F.3d at 395 (quoting *Scott v. Heckler*, 770 F.2d 482, 485 (5th Cir. 1985)); *see Myers*, 238 F.3d at 621; *Newton*, 209 F.3d at 455-56; *Greenspan*, 38 F.3d at 237. "Good cause" may exist when the treating physician's statements are "brief and conclusory, not supported by medically acceptable clinical laboratory diagnostic techniques, or otherwise unsupported by the evidence." *Myers*, 238 F.3d at 621; *see Greenspan*, 38 F.3d at 237; *see also Newton*, 209 F.3d at 456. But Fifth Circuit precedent is clear that,

> A finding that a treating source medical opinion is not well supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to "controlling weight," not that the opinion should be rejected. *Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. § 404.1527 and 416.927.* In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted even if it does not meet the test for controlling weight.

*Id.* (emphasis in original) (quoting SSR 96-2p). Clearly then, a claimant is entitled to a remand if the ALJ rejects, or gives little weight to, a treating specialist's opinion without considering each of the factors set out in the Social Security regulations. *Myers*, 238 F.3d at 621; *Newton*, 209 F.3d at 456. Those factors are the following:

> (1) the physician's length of treatment of the claimant,
> (2) the physician's frequency of examination,
> (3) the nature and extent of the treatment relationship
> (4) the support of the physician's opinion afforded by the medical evidence of record,

(5) the consistency of opinion with the record as a whole; and

(6) the specialization of the treating physician.

*Newton*, 209 F.3d at 456; 20 C.F.R. § 404.1527(d)(2)-(6); *see Myers*, 238 F.3d at 621.

Here, the ALJ made clear that Dr. Guerrini's assessment of Plaintiff's lower back pain is not supported by the medical evidence. (Tr. at 19). The ALJ pointed out that "the opinion of disability is strictly reserved to the Commissioner of the Social Security Administration." (*Id.*). He then stated:

> The undersigned does not give the opinion of the claimant's treating physician controlling weight as it is not well supported by medically acceptable clinical and laboratory techniques and is inconsistent with other substantial evidence of record, including his own prior statements and clinical findings which render it less persuasive.

(*Id.*). The ALJ had "good cause" to scrutinize Dr. Guerrini's medical opinion. Dr. Guerrini reported, in June, 2004, that Plaintiff was not 100% disabled and could engage in gainful employment. (Tr. at 320). However, in December, 2005, Dr. Guerrini stated that Plaintiff, in fact, was permanently disabled. (Tr. at 334). But this conclusion was not supported by any clinical findings. (*Id.*). At the hearing, Dr. Hoang testified that Dr. Guerrini's reports were inconsistent, and that no appropriate medical examinations, necessary to prove Plaintiff's level of disability, had been performed. (Tr. at 377-78, 382). In light of the evidence, the ALJ did not err in refusing to give the opinion from Plaintiff's treating physician controlling weight.

Plaintiff also challenges the ALJ's determination, at step five of the analysis, that he retains the residual functional capacity to perform the exertional demands of "a wide range of sedentary work." (Plaintiff's Motion at 10). "The term 'residual functional capacity' is defined as the most an individual can still do after considering the physical and mental limitations that

affect the ability to perform work-related tasks." *Ray v. Barnhart*, 163 Fed. Appx. 308, 312 n.6

(5th Cir. 2006) (citing 20 C.F.R. § 416.945(a)(1)); *see Myers*, 238 F.3d at 620.   From the

applicable regulation, "sedentary work" includes the following:

> lifting no more than 10 pounds at a time and occasionally lifting or carrying
> articles like docket files, ledgers, and small tools. Although a sedentary job is
> defined as one which involves sitting, a certain amount of walking and standing is
> often necessary in carrying out job duties. Jobs are sedentary if walking and
> standing are required occasionally and other sedentary criteria are met.

20 C.F.R. § 404.1567(a). Here, Plaintiff has failed to produce any evidence, besides Dr.

Guerrini's statements, that he is unable to perform sedentary work.  The ALJ did not give Dr.

Guerrini's statements controlling weight because they were "not well supported" by medical

evidence and were "inconsistent" with the record.  (Tr. at 19).  In addition, both Dr. Rowlands

and Ms. Johnson stated Plaintiff could perform a wide range of sedentary work.  (Tr. at 311, 386-

87). Dr. Rowlands, who examined Plaintiff on behalf of the state, determined that Collins could

lift and carry 25 pounds frequently and 50 pounds occasionally, stand or walk for about 6 hours

within an 8 hour-work day, sit for about 6 hours within an 8 hour-work day, and could climb

ramps and stairs, balance himself, stoop, kneel, crouch, and crawl. (Tr. at 311).  At the hearing,

Ms. Johnson, the vocational expert witness, testified that Plaintiff had the necessary "transferable

skills" for a variety of sedentary jobs.  (Tr. at 386-87).  In light of both Plaintiff's RFC assessment

and the testimony of the vocational expert witness, the ALJ did not err in concluding Plaintiff was

able to perform sedentary work.

Finally, Plaintiff contends that the ALJ was biased against him because he is African-

American. (Plaintiff's Motion at 14).  However, the fact that the ALJ denied Plaintiff's claim,

standing alone, is no indication that he was biased against Plaintiff, as an African American, or

40

that he holds a bias against African-Americans, generally.  *See Withrow v. Larkin*, 421 U.S. 35, 47 (1975).  The Supreme Court has stated that a presumption of honesty and integrity exists for those who serve as adjudicators for administrative agencies.  (*Id.*).  The Court also stated that the burden to overcome this presumption rests on the party making the assertion of bias.  *See Schweiker v. McClure*, 456 U.S. 188, 195-96 (1982).  To rebut the presumption, a plaintiff must show that there is a conflict of interest or some other specific reason that an adjudicator should be disqualified.  *See id.*).  In fact, the presumption can be overcome only with convincing evidence that "a risk of actual bias or prejudgment" is present.  (*Id.*).  The Supreme Court set out the standard to establish such bias.  *See Liteky v. United States*, 510 U.S. 540, 555 (1994). The Court stated that, "[J]udicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge" unless "they reveal such a high degree of favoritism or antagonism as to make fair judgment impossible." (*Id.*).  The Fifth Circuit has similarly stated that "a substantial showing of personal bias is required to disqualify a hearing officer or to obtain a ruling that the hearing is unfair."  *Miranda v. National Transp. Safety Bd.*, 866 F.2d 805, 808 (5th Cir. 1989) (citing *Roberts v. Morton*, 549 F.2d 158, 164 (10th Cir. 1976)).  Here, Plaintiff has failed to show evidence of racial bias or prejudice on the part of the ALJ.  In fact, Plaintiff has not pointed to a single instance of prejudice on the part of the ALJ during the administrative process.  The record does not contain any evidence, or even suggestion, of bias against Plaintiff's race.  Although Plaintiff points to statistical data which states that first-time approval ratings by the SSA for African Americans is between 32% and 40% while comparable approval ratings for Caucasian applicants is 70%, this data alone is not conclusive of a personal bias on the part of the ALJ.  (*See* Plaintiff's Motion at 14).  The record, as a whole, supports the ALJ's decision that Plaintiff's

impairments are not disabling.  Nothing in the record suggests that the ALJ was swayed by racial bias.

In sum, the ALJ's decision to deny disability benefits to Collins is supported by substantial evidence, and was rendered in accordance with the law governing his claim.  For that reason, it is RECOMMENDED that Plaintiff's motion for summary judgment be DENIED, and that Defendant's motion for summary judgment be GRANTED.

**Conclusion**

Accordingly, it is **RECOMMENDED** that Plaintiff's Motion for Summary Judgment be **DENIED**, and that Defendant's Motion for Summary Judgment be **GRANTED**.

The Clerk of the Court shall send copies of the memorandum and recommendation to the respective parties, who will then have ten business days to file written objections, pursuant to 28 U.S.C. § 636(b)(1)(c), General Order 02-13, S.D. Texas.  Failure to file written objections within the time period provided will bar an aggrieved party from attacking the factual findings and legal conclusions on appeal.

The original of any written objections shall be filed with the United States District Clerk, P.O. Box 61010, Houston, Texas 77208; copies of any such objections shall be delivered to the chambers of Judge Lee H. Rosenthal, Room 11535, and to the chambers of the undersigned, Room 7007.

**SIGNED** at Houston, Texas, this 13th day of August, 2008.

**MARY MILLOY**
**UNITED STATES MAGISTRATE JUDGE**